STATE OF VERMONT

ENVIRONMENTAL COURT

Secretary, Vermont Agency of Natural Resources,    }
                                         }
           v.                            }           Docket No. 129-8-03 Vtec
                                           }
Fern Hill Farm, Ltd. and Stephen Bromley,      }
        Respondents.                     }

Decision and Order

On July 15, 2003, the Secretary of the Vermont Agency of Natural Resources (ANR) issued an administrative order pursuant to 10 V.S.A. §8008 regarding Respondent Stephen Bromley, who timely requested a hearing in Environmental Court. On September 15, 2003, the Secretary moved to amend the administrative order to add Fern Hill Farm, Ltd. as a Respondent; the Court granted the motion. At trial on April 6, 2005, the Court granted the Secretary's further motion to amend the administrative order to change the date of the fire described in the administrative order from May 5, 2001 to May 4, 2001, to conform to the evidence. Respondents are represented by John D. Hansen, Esq.; and the Secretary of the Agency of Natural Resources is represented by Gary S. Kessler, Esq.

The Court extended the time for the hearing for good cause at the request of and by agreement of the parties, to accommodate the schedules of the parties and to allow an extended period of negotiation.

The statutes, rules and permits applicable to this matter are 4 V.S.A. Chapter 27; 10 V.S.A. Chapters 23, 159 and 201; Sections 6-302(a) and 6-302(d) of the Vermont Solid Waste Management Rules; and Section 5-201 of the Vermont Air Pollution Control Regulations. 10 V.S.A. §8012(c)(2).

1

<u>Findings</u>

Respondent Fern Hill Farm, Ltd. was incorporated in April of 1975; its principal business is farming. It owns approximately 350 acres of property located on Creek Road in the towns of Wallingford and Clarendon, Vermont. Respondent Stephen Bromley is the president of and registered agent for Fern Hill Farm, Ltd. and as of the date of trial had been farming there for 32 years. He lives at the property with his wife and three children, and manages the property, including the farming operations and the maintenance of the houses and other buildings on the property. As of the date of trial some 50 to 85 dairy cows or other cattle were being raised on the property. Between 1972 and the incorporation of Fern Hill Farm, Ltd. in 1975, the farm was owned by Respondent's father.

In connection with a civil nuisance action brought by Respondent Bromley and others, in about 1977 the Town of Wallingford had been allowed to bury a town dump that had burned, constituting a much larger amount of waste than at issue in the present case. The Town was not required to remove any of the waste or to dispose of it at a certified waste disposal facility. No evidence was presented as to the state solid waste statutes[1] or regulations, if any, in effect at the time of the burial of the Town dump or whether it constituted a violation of any state statutes or regulations in effect at the time, as well as having been a civil nuisance.

Respondent Bromley resides in a house on the property. Two other houses are also located on the property which are rented to tenants. As of May of 2001, and for many years before that date, an old gravel pit was located on the Wallingford portion of the property, behind one of the rental houses. That house had been rented to a single tenant for the past 33 years. The old gravel pit site was not visible from Creek Road as it was surrounded by trees and was located at an elevation lower than that of Cliff Road, over a steep bank.

---

[1] The Vermont Solid Waste Management Act was adopted effective July 1, 1977.

2

Access to the old gravel pit site was through the private driveway of the rental house and past a small outbuilding.

The old gravel pit site had been used as a farm dump for approximately fifty years prior to July 1, 1991, including the disposal of construction and demolition waste[2] from the renovation of one of the houses on the farm property in 1987. For the purposes of discussion we will refer to the portion of the old gravel pit use for disposal of solid waste as the 'old Fern Hill farm dump site;' the use of this phrase does not constitute any factual finding as to whether all of the waste disposed at the site originated on the farm property.

The 1989 Vermont Solid Waste Management Rules, §301(b)(1), exempted from regulation:

> [s]ites existing on the effective date of these rules that are used exclusively for the disposal of normal residential solid waste generated by the owner of the site, unless the Secretary determines that the site poses a threat to public health and safety or the environment or cause[s] a nuisance; such exemption expires on July 1, 1991.

No evidence was presented as to whether "normal residential solid waste" or "residential solid waste" was specifically defined in the 1989 Vermont Solid Waste Management Rules; those terms are not defined in the statute. Farm dumps were evaluated as residential solid waste dumps with respect to the exemption. Thus, assuming that the Fern Hill farm dump site had existed for a long time as of the adoption of the 1989 Vermont Solid Waste Management Rules, that it had not been determined to pose a threat to public health and safety or the environment or to cause a nuisance, and that only normal residential waste generated on the farm property was disposed there, it was allowed to continue to be used

---

[2] This term is defined in the 1999 Vermont Solid Waste Management Rules as "waste derived from the construction or demolition of buildings, roadways or structures[,] including but not limited to clean wood, treated or painted wood, plaster, sheetrock, roofing paper and shingles, insulation, glass, stone, soil, flooring materials, brick, masonry, mortar, incidental metal, furniture and mattresses." §6-201.

3

for that purpose and to be exempt from regulation through July 1, 1991.

However, as that exemption expired by its own terms[3] as of July 1, 1991, after that date the use of the Fern Hill farm dump to dispose of other than exempt materials under the Vermont Solid Waste Management Rules would have been a violation of those rules, regardless of how long it had been used as a farm dump prior to that date. That is, the §301(b)(1) exemption in the 1989 Rules allowed farm dumps to continue for approximately an additional two years, beyond the time that those rules would have required that practice to cease. It did not exempt farm dumps and residential household waste dumps beyond July of 1991.

The Vermont Solid Waste Management Rules in effect as of May 2001 exempt "the disposal of trees, stumps, yard waste, and wood chips generated from these materials, when the origin and disposal of such waste occurs on property under the same ownership or control." §6-301(b)(1). Those rules also provide an exemption in §6-1103(a) for composting of certain farm-generated materials, wood waste, organic waste, and yard waste. Those rules also provide a mechanism for applying for approval of so-called "insignificant waste management events" that are of limited duration and will not result in a threat to the public health and safety or to the environment, and will not create a nuisance. §6-301(c). Those rules also provide for "categorical disposal certifications" under §6-309 for a number of categories of wastes, including "stumps, brush or untreated wood," §6-309(b)(1), and "concrete, masonry, mortar, or other inert materials," §6-309(b)(4).

After July 1, 1991, Respondents allowed the dumping of solid waste to continue at

---

[3] An internal agency memorandum issued on February 25, 1997, clarified the Solid Waste Management Program's position that farm dumps had been evaluated as residential dumps under this exemption. This document, in evidence as Exhibit 17, did not have any independent regulatory effect. Moreover, the farm dump in the present case was used to dispose of non-residential solid waste, such as construction and demolition waste, which was not in any event covered by the exemption.

4

the old Fern Hill farm dump site, at least including construction and demolition debris from remodeling work done on one of the rental houses in approximately 1993, and at least including construction and demolition debris resulting from other work being done on the farm property (including the houses, barns and outbuildings) in early 2001, and some household solid waste generated by Respondent Bromley and the tenants' households in 2001. Respondents did not take steps to limit access to the area after existing "No Trespassing" signs were removed, other than the fact that the access roadway was not obvious. Nor did they report to any state officials if solid waste generated off the property was being disposed at the old Fern Hill farm dump site by others. Solid waste was placed at the dump site without being covered over with soil. Neither Respondent Bromley nor Respondent Fern Hill Farm, Ltd. was in the business of operating a trash hauling enterprise or a waste disposal site. No evidence was presented to suggest that either Respondent had authorized the disposal of waste at the old Fern Hill farm dump site that had been generated off the property, nor that either Respondent received any compensation for any such disposal. To the extent that construction and demolition debris from work being done on buildings on the Fern Hill Farm property was placed at the old Fern Hill farm dump site after July 1, 1991, Respondent Fern Hill Farm, Ltd. did avoid incurring the costs of proper disposal of such material. To the extent that household solid waste generated on the Fern Hill Farm property was placed at the old Fern Hill farm dump site after July 1, 1991, Respondents did avoid incurring the costs of proper disposal of such material. No evidence was presented as to those avoided costs.

A "burn permit" is required by the Town of Wallingford to be obtained from the fire warden prior to any fires; the fire warden inspects the site prior to the fire and registers the burn permit with the police. See Vermont Air Pollution Control Regulations §5-202. Natural or untreated wood is allowed to be burned; neither the painted wood boards nor any of the construction and demolition debris or other solid waste would have qualified

5

for a burn permit. The then-Deputy municipal Fire Warden Dave Gilman required a written permit for fires within his jurisdiction, which included Respondents' property. The Fire Warden, who covered East Wallingford, but not Respondents' property, may have allowed burn permits to be telephoned in within his jurisdiction, but Respondent Bromley did not claim to have telephoned a request for a burn permit for the May 4, 2001 fire. The Deputy Fire Warden had warned Respondent Bromley on two previous occasions (on May 22, 2000, and on June 5, 2000) regarding burning without a burn permit, and had issued a municipal ticket to him regarding a burn in late April 2001, during which a nearby field caught on fire. In connection with those warnings, the Deputy Fire Warden did not have occasion to see the old Fern Hill farm dump site or any materials located at the old Fern Hill farm dump site before May 4, 2001. Respondents did not apply for or obtain a municipal burn permit for a fire at the old Fern Hill farm dump site on May 4, 2001. Due to Respondent Bromley's knowledge of the burn permit requirement, we find that he also knew that the burning of anything but untreated wood was not permitted, separate and apart from the municipal requirement to have a burn permit to burn untreated wood. In any event, the present Administrative Order case is not a municipal enforcement case and does not charge failure to obtain a burn permit.

On May 4, 2001, at about 6:00 p.m., Deputy Fire Warden Dave Gilman arrived at the scene of a fire at the old Fern Hill farm dump site. From the appliances, tires, asphalt shingles, construction and demolition debris, and metal waste that he observed, he determined that the fire was beyond the scope of the municipal burn permit requirement, and that some dumping of solid waste had occurred which would need to be investigated by the state Agency of Natural Resources. He called state Environmental Investigator Don Gallus to come to the site. The fire emitted odors of burning garbage (household solid waste) and burning rubber.

Both the Deputy Fire Warden and the state Environmental Investigator were at the

6

site on May 4 and May 5, 2001, and took photographs which were admitted in evidence. The old Fern Hill farm dump site contained tires, asphalt shingles, a fertilizer chemical or soap container and other plastic containers, roofing tar paper, plastic, painted wood, household trash, upholstered furniture, mattresses, appliances (white goods) and metal wastes, both at the lower elevation of the site and as piles on the top of the bank that had not yet been pushed down the bank. Some of the waste had been placed at the site relatively recently, that is, within the previous few months, as the lumber, shingles, and roofing metal was not weathered, the piles were not flattened, and no foliage had grown up through or among the piles, and some of the mail and prescription bottles found in the household garbage bore dates from April of 2001, and were addressed to Respondent Bromley and his tenants. No evidence was presented that the material had not come from the property of Fern Hill Farm, Ltd.

The open burning of materials such as tires, asphalt shingles, plastics and metals creates the potential for harm to the environment and to human health, due to the release of air pollutants such as formaldehyde, dioxins and other hydrocarbons, fine particulates and heavy metals, which can have health effects, especially on vulnerable populations such as children and the elderly, and which may accumulate in meat and milk from farm animals. The presence of smoke in a fire indicates incomplete combustion, in which the fire gives off fumes and gases that constitute hazardous air pollutants. The burial of such materials in the ground without a liner, if in contact with rainwater or groundwater, may result in the leaching of harmful substances from the buried materials into the groundwater and to nearby streams.

The May 2001 fire started because Respondent Bromley, tenants on the Fern Hill Farm property, or contractors working on demolition of or improvements to buildings on the property, were burning old boards from the Fern Hill Farm property, and the fire spread to the other solid waste already placed at the dump site. Respondent Bromley did

not start the fire for the purpose of burning the garbage or the other materials already placed at the dump site, but that was the result of the fire. Three fire departments responded to the fire and worked to put it out. In addition, Respondent Bromley operated a small bulldozer to help put out the fire by pushing sand over the burning materials.

The fire continued to burn underground for at least four days. Respondents hired a construction company with an excavator to dig up the materials so that they could be soaked with water by the Wallingford Fire Department, finally extinguishing the fire. Respondents did not place in evidence their costs of hiring the excavator or operator. The then-Deputy Fire Warden returned to the site every day until the fire was out. He observed in the southern part of the old Fern Hill farm dump site, away from where the fire had started, that there were bags of household garbage containing items having the names of Respondent Bromley and his current tenants on them, as well as fresh (non-weathered) lumber, and that no grass or other vegetation had grown up around it, suggesting that the garbage and discarded materials had been placed there relatively recently. He observed paint cans and buckets of plaster whose contents were still wet, suggesting that the garbage and discarded materials had been placed there relatively recently. The fire warden also observed piles of burned debris from previous fires.

An undetermined amount of the waste depicted in the photographs taken during the fire may have been burned up in the fire.

When Environmental Investigator Don Gallus saw the dump being covered by sand on May 4 or May 5, 2001, and spoke with the Fire Chief Warren Allen, he suggested that it was not a good idea to completely bury the dump, as some of the materials or items would probably have to be removed. He also instructed Respondent Bromley to refrain from burying any more of the dump; Respondent Bromley stopped shortly thereafter.

The area of the old Fern Hill farm dump site used for solid waste disposal was approximately fifty yards in length by twenty-five yards in width, or approximately 1,250

8

square yards in area. However, no evidence was presented as to the depth of material from which the Court could make findings as to the estimated volume of material or what had been placed in the ten years since July 1991, as contrasted with that placed at the site prior to that date. No evidence was presented as to the cost of investigation of such an area. While Respondent Bromley presented evidence of a conversation he had had with a consultant, suggesting that the cost-per-ton of proper disposal was $50 per ton in 2001, no evidence was presented from which the Court could make findings as to the number of tons that might have had to have been removed, and therefore to support his estimate that compliance in this case would cost from $60,000 to $70,000. No evidence was presented from which the Court could determine whether any of the solid waste at the site could then have qualified to have been buried on site, either under an insignificant waste management event approval, §6-301(c), or under a categorical disposal certification, §6-309, rather than having to have been removed for disposal off site.

Environmental Investigator Gallus told Respondent Bromley that the case would be sent to the Agency of Natural Resources for further review, and that Respondent Bromley would be hearing from the Agency regarding "the clean up or burial of the dump." Environmental Investigator Gallus also consulted with Agency personnel as to whether any hazardous materials were implicated in this site and determined in mid-May of 2001 that the site was not of concern to the hazardous materials program of the Agency.

Environmental Investigator Gallus sent a Complaint Investigation Report to his supervisor at the Agency, reporting on his observations regarding the old Fern Hill farm dump site, and stating that he had told Respondent Bromley that he "would be sending the case to headquarters and he would be hearing from us as to the disposition of the case and the clean up or burial of the dump." Environmental Investigator Don Gallus closed his file on the investigation on June 28, 2001, with the filing of a Supplemental Complaint Report describing his interview with then-Deputy Fire Warden Dave Gilman, as Mr. Gilman had

9

not provided him with a written statement by that time and was not expected to do so.

Neither Respondent Bromley nor Respondent Fern Hill Farm, Ltd. received any contact from the Agency during the remainder of 2001. As of December of 2001, Respondent Bromley assumed that the matter as closed and that no further directives would be coming from the Agency; indeed, he hoped that the Agency had "forgotten about it." He did not telephone or write to anyone in the Agency to substantiate this assumption.

Respondent Bromley wished to convert the area of the old Fern Hill farm dump site to productive crop land for use in the farming operations of Fern Hill Farm, Ltd., and to eliminate the potential for unauthorized dumping of solid waste or construction and demolition waste in this unobserved location. In December of 2001 Respondents hired a contractor to cut down the trees around the old Fern Hill farm dump site, strip and stockpile the topsoil, bury the stumps and logging debris and the underlying old Fern Hill farm dump site, and spread the topsoil. The work cost Respondents approximately $10,000 and was finished by some time in January of 2002. Respondents have used the area as a farm field to grow alfalfa and corn since the growing season of 2002; the area has not been used for dumping of solid waste since that time.

In April of 2002, after this work had been completed, Respondents received a letter from the Agency's Environmental Enforcement Division regarding the violations.

Conclusions as to Violation (10 V.S.A. §8012(c)(1)):

The Uniform Environmental Enforcement statute requires this Court to determine whether a violation has occurred, 10 V.S.A. §8012(b)(1), independently of addressing any remedial provisions of the emergency order, 10 V.S.A. §8012(b)(2) and (3), and independently of reviewing and determining anew a penalty amount. 10 V.S.A. §8012(b)(4).

By disposing of or allowing the disposal of solid waste (discarded materials) in the

10

old Fern Hill farm dump site after July of 1991 without qualifying for an exemption under §6-301(b) or (c), Respondent Fern Hill Farm, Ltd.[4] has violated §6-302(d) of the Solid Waste Management Regulations, as it held no permit or other approval for disposal of any type of solid waste at the site.

By allowing the open burning of solid waste at the old Fern Hill farm dump site in May of 2001, not in accordance with the Air Pollution Control Regulations, Respondent Bromley[5] violated §6-302(a) of the Solid Waste Management Regulations. By causing, suffering, allowing or permitting the open burning of garbage, tires, rubber, plastic, asphalt materials and treated wood at the old Fern Hill farm dump site in May of 2001, Respondent Bromley[6] violated §5-201 of the Air Pollution Control Regulations.


Determination of Order and Penalty (10 V.S.A. §8012(c)(3)):

The Administrative Order contained remedial provisions as well as a penalty; therefore, the Court must review and determine anew an appropriate penalty amount for the violations (by applying the eight criteria set forth in 10 V.S.A. §8010(b)); must review the remedial portions of the order; and must determine whether the remedial portion of the order was issued under 10 V.S.A. §8008(b)(5), and, if so, whether it is reasonably likely to achieve the intended result. 10 V.S.A. §8012(b)(2), (3) and (4).

Remedial Order

The remedial portion of the Administrative Order operates only against Respondent

---

[4] The Amended Administrative Order, ¶4, alleges this violation only with respect to Respondent Fern Hill Farm, Ltd., and not with respect to Respondent Bromley.

[5] The Amended Administrative Order, ¶6, alleges this violation only with respect to Respondent Bromley, and not with respect to Respondent Fern Hill Farm, Ltd.

[6] The Amended Administrative Order, ¶7, alleges this violation only with respect to Respondent Bromley, and not with respect to Respondent Fern Hill Farm, Ltd.

11

Fern Hill Farm, Ltd. and only addresses the solid waste disposal violation. Paragraph B requires Respondent Fern Hill Farm, Ltd. to "engage the services of a consultant experienced in the investigation and remediation of solid waste sites." Paragraph C requires Respondent Fern Hill Farm, Ltd. to require the consultant "to submit a work plan for clean up of the site to the Solid Waste Management Program (SWMP) [of the Agency] for approval;" and requires that the work plan "should provide for proper disposal of all solid waste at a Vermont-certified disposal or treatment facility, or an out-of-state disposal [or] treatment facility approved by the SWMP, and for the inspection and documentation of the clean up by the consultant." Paragraph D requires Respondent Fern Hill Farm, Ltd. to "complete all work in conformance with the corrective action plan and to the satisfaction of the SWMP" within sixty days of written approval of the plan; to notify the SWMP of the date the removal is to begin; and to allow inspection of the site during the removal and for a period of ninety days after the removal. Paragraph E requires Respondent Fern Hill Farm, Ltd. to submit all investigative reports, analytical results and receipts for disposal fees related to the remedial work to the SWMP, as those reports, results and receipts become available.

None of the remedial provisions of the order were issued under 10 V.S.A. §8008(b)(5); therefore we do not analyze them as to whether they are reasonably likely to achieve the intended result. On the other hand, the remedial provisions of the order must allow the consultant to distinguish between household waste disposed legally at the site during the period in which farm dumps were exempt, prior to July 1, 1991, and other waste that may be required to be removed. See Agency of Natural Resources v. Towns, 173 Vt. 552, 555-57 (2001). Similarly, the remedial provisions of the order should allow the consultant to analyze whether any of the waste in the site may qualify to be left in place or buried, with or without any provision for test holes or monitoring wells to determine whether leachate is being produced by the site. 10 V.S.A. §8012(b)(2).

12

Because we have amended the order to allow the consultant to determine whether any of the waste in the site may qualify to be left in place or buried, we need not address whether the costs of digging up the entire site would be excessive.

<u>Penalty</u>

In addition to addressing the remedial provisions, the Court must review and determine anew an appropriate penalty amount for the violations by applying the eight criteria set forth in 10 V.S.A. §8010(b). 10 V.S.A. §8012(b)(4). In the Administrative Order the Secretary imposed a penalty of $5,250 for the violations; in this proceeding the Secretary continues to request the same amount.

First we must note that for a civil penalty to withstand constitutional scrutiny it must be basically remedial in effect, rather than punitive. The methodology inherent in the statute and applied by this Court is to remove the economic benefit gained from the violation, in order to carry out the statutory purpose of preventing the unfair economic advantage obtained by persons who operate in violation of environmental laws, 10 V.S.A. §8001(2) and §8010(b)(5), and then to apply the remaining statutory factors to determine what additional penalty is needed, or whether mitigating factors should reduce any element of the penalty. That is, the entire economic benefit first must be removed to carry out a primary purpose of the Uniform Environmental Enforcement Act: to make it less expensive to comply with the law than to violate it.

No evidence was presented from which the Court could determine the economic benefit either Respondent may have obtained from any of the violations. There was no evidence that anyone paid Respondents to burn or bury any of the solid waste at that location. Respondents did receive the economic benefit of disposing of construction and demolition waste from work done on the property in 1987, in approximately 1993, and in 2001. The economic benefit could be assessed at the avoided cost of removing the all the solid waste placed at the location since July 1, 1991, other than natural wood (for which a

13

burn permit could have been obtained), and other than any inert construction and demolition waste for which Respondents are able to obtain either an insignificant waste management event approval, §6-301(c), or a categorical inert waste disposal certification, §6-309(b) and (c). However, there was no estimate of the volume or weight of the waste, only of its area; so that even Respondent's own estimate of $50 per ton cannot be applied to any specific number. Moreover, there was no estimate of the amount of waste disposed of since July 1, 1991, or even of the amount of waste seen to be in current piles as of the date of the fire.

We take each of the penalty factors in turn. The economic benefit to Respondent for the violations would have been the avoided cost of the permit applications plus the avoided cost of proper disposal of the post-July 1, 1991 waste, and any waste for which certifications or approvals could not be obtained to allow the waste to be left in place. As discussed above, without that evidence we cannot calculate any economic benefit in this case.

Both the burning and the burial have created the potential for environmental harm and harm to human health, due to the release of harmful contaminants into the air and potentially through leaching into the groundwater or nearby surface waters. The open burning violations existed for several days. The solid waste violation existed for years: at least since the disposal of construction and demolition waste in approximately 1993. §8010(b)(1) and (b)(8).

We consider as a mitigating circumstance that the Agency failed to contact Respondent Bromley between May of 2001 and January of 2002, when he had the old Fern Hill farm dump site filled in and converted to crop land. However, it is important to recognize that, by telling him at the fire to cease burial of the materials because some of them may have had to have been removed, the Agency did put Respondent Bromley on notice that the burial of waste at the site might be a violation. Prior to the fire, however,

14

we cannot determine that Respondent Bromley should have known that burial of waste generated on the Fern Hill Farm property was a violation, as no evidence was presented relating to the Agency's practices of notifying farmers from 1989 (when the Solid Waste Management Regulations went into effect with the farm dump exemption), to 1991 (when that exemption expired), nor of the Agency's practices since that date. Respondent Bromley knew or should have known that open burning of other than untreated wood was a violation, based on his experiences with earlier open burning municipal violations. §§8010(b)(2) and (3).

Respondent has no prior record of non-compliance regarding solid waste disposal violations or regarding burning of impermissible waste. Respondent has previously violated the requirement to obtain a local permit prior to any open burning. §8010(b)(4).

The Secretary did not present evidence to support any finding as to the Agency's actual costs of enforcement, including the amount or cost of the time spent by Mr. Gallus in the 2001 investigation, and the time of the witnesses and attorney at trial. §8010(b)(7).

With regard to considerations of deterrence, Respondents' expenditure of funds and time in fighting the fire, including hiring the excavator equipment and operator, and Respondents' expenditure of approximately $10,000 in converting the old Fern Hill farm dump site to crop land, taken together with the funds that will have to be expended on a consultant to determine whether and how much of the buried site will have to be excavated, combined with the cost of the present litigation, will have a sufficient deterrent effect so that no additional penalty is required beyond the components already discussed. §8010(b)(6).

Accordingly, taking all these factors into account, the Court will impose a penalty for the open burning violations of $750, which accounts for the actual and potential environmental harm of burning but also for the work and funds expended by Respondents on fighting the fire, and the fact that it was not intentionally started by Respondents for the

15

purpose of burning solid waste. Taking all these factors into account, the Court will impose a penalty for the solid waste violations of $4500, to be placed in escrow and used towards the investigative work ordered in Paragraph C of the Amended Administrative Order as amended by this decision and order and, if any remains after that investigative work is done, to be used for any remedial work that may be required by the plan required in Paragraph C of the Amended Administrative Order as amended by this decision and order. Placing the penalty in escrow and allowing Respondents to use it towards the investigative and remedial work recognizes that the burial and consequent increased cost of investigation and potential for increased cost of remediation was in large part due to the lapse of time between the May 2001 referral of the matter from the Environmental Investigator to the Agency and the January 2002 date of the burial and recognizes that Respondents spent $10,000 on the burial and conversion of the site to farmland. On the other hand, this penalty also recognizes that Respondent Fern Hill Farm, Ltd. was and is responsible for the proper disposal of the waste improperly disposed at the old Fern Hill farm dump site since July 1, 1991, and in particular for the construction and demolition waste generated as a result of maintenance of and improvements to the houses and other buildings on the farm property, and any household solid waste generated on the farm property, even if that remedial work exceeds the amount of the penalty placed in escrow.

Accordingly, taking all these factors into account, and based on the findings, conclusions, and reasoning of this decision, it is hereby ORDERED and ADJUDGED that:

Paragraph A of the Amended Administrative Order is vacated and replaced by the following:. On or before March 17, 2006, Respondent Bromley shall pay a penalty of $750 for the open burning violations to the State of Vermont, to be deposited in the general fund pursuant to 10 V.S.A. §8010(e); and on or before March 17, 2006, Respondent Fern Hill Farm, Ltd., shall pay a penalty of $4,500 for the solid waste violation, to be placed in escrow

16

until the work plan required by Paragraph C has been prepared, at which time Respondent may apply for it to be released to pay for the preparation of that work plan, including any necessary investigatory work. Any portion of this penalty remaining in escrow after the preparation of the work plan may be released to pay for any remedial work required under the Amended Administrative Order as modified by this decision and order. Respondents may discuss with the Agency of Natural Resources an alternate payment schedule; if any such schedule is agreed to, the parties may submit it to the Court as an agreed amendment to this order.

Paragraph B of the Amended Administrative Order is modified to add the following sentence, and as modified is affirmed: Reasons shall be stated for disapproval of any proposed consultant, and Respondents may apply to the Secretary for review of any such decision under the Agency's internal administrative procedures.

The first sentence of Paragraph C of the Amended Administrative Order is modified to add the following phrase after the word "site," and as modified is affirmed: "including proposals for any appropriate removal of material placed in the site after July 1, 1991, and including proposals for approval of burial of any of the material in the site." The second sentence of Paragraph C of the Amended Administrative Order is modified to change the phrase "all solid waste" to "all solid waste removed from the site," and as modified is affirmed. Paragraph C of the Amended Administrative Order is modified to add the following sentence, and as modified is affirmed: Reasons shall be stated for disapproval of any element of the proposed plan, and Respondents may apply to the Secretary for review of any such decision under the Agency's internal administrative procedures.

Paragraphs D and E of the Amended Administrative Order are affirmed.

Any party wishing a separate V.R.C.P. 58 judgment order may propose one for the Court's signature so that it is received by the Court on or before January 27, 2006; otherwise

17

it will be deemed to have been provided by the above paragraphs modifying the Administrative Order, as required by 10 V.S.A. §8012(b).

Rights of Appeal (10 V.S.A. §8012(c)(4) and (5)):

WARNING: this decision will become final if no appeal is requested within 10 days of receipt of this decision (or subsequent judgment order if one is issued). Respondent and the Secretary of the Agency of Natural Resources have a right to appeal this decision. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6)(A). Within 10 days of receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of this Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. §8013(d). A party may petition the Supreme Court for a stay under the provisions of V.R.E.C.P. 4(d)(6)(B) and V.R.A.P. 8.

Done at Berlin, Vermont, this 20th day of January, 2006.

_____
Merideth Wright
Environmental Judge

18